# In the United States Court of Federal Claims

**No. 08-118C**
**(Filed: July 3, 2008)****
****OPINION ORIGINALLY FILED UNDER SEAL ON JUNE 25, 2008**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| **OMEGA WORLD TRAVEL, INC.,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Bid Protest; Federal Acquisition Streamlining Act ("FASA"), Pub.L. No. 103-355; FAR 16.505(a)(9); Jurisdiction Limited to Challenge of Scope of Task Order; Procurement Integrity Act, 41 U.S.C. § 423.** |
| **THE UNITED STATES,** | * | |
| **Defendant,** | * | |
| **and** | * | |
| **CW GOVERNMENT TRAVEL, INC.,** | * | |
| **Defendant-Intervenor.** | * | |
| * * * * * * * * * * * * * * * * * * * | * | |

*Bryant S. Banes,* Houston, TX, for plaintiff. *Sean D. Forbes*, Houston, TX, of counsel.

*Douglas K. Mickle,* U.S. Department of Justice, Washington, DC, with whom were *Jeffrey S. Bucholtz, Acting Assistant Attorney General* and *Director Jeanne E. Davidson,* for defendant. *John Caterini* and *Barbara Marvin*, U.S. Department of Justice and *Virginia S. Grebasch*, U.S. General Services Administration, of counsel.

*Lars E. Anderson*, Vienna, VA, for defendant-intervenor. *Peter A. Riesen* and *Patrick R. Quigley*, Vienna, VA, of counsel.

## O P I N I O N

**FIRESTONE**, *Judge*.

This case comes before the court on motions by the defendant, the United States ("defendant" or "government"), and by the intervenor, CW Government Travel, Inc. ("CWGT"), to dismiss the plaintiff's complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") for lack of jurisdiction, or, in the alternative, for judgment upon the administrative record pursuant to RCFC 52.1, and a motion by the plaintiff, Omega World Travel, Inc. ("plaintiff" or "Omega"), for judgment upon the administrative record pursuant to RCFC 52.1. In its complaint, the plaintiff asserts that the government improperly and in bad faith terminated two travel services contracts between the plaintiff and the United States Department of Justice ("DOJ") with the intention of transferring the services provided under the contracts to CWGT through two sub task orders issued under a master task order issued under a master Indefinite Delivery Indefinite Quantity ("IDIQ") contract held by CWGT. The plaintiff also contends that the services to be transferred to CWGT under the sub task orders materially depart from the scope of the master IDIQ contract under which the master task order was awarded to CWGT.[1] Finally, the plaintiff asserts that the government released the

---

[1] This case involves a series of competing and cascading government contracts that can be briefly described as follows: (1) CWGT was one of three entities awarded a master IDIQ contract for E-Gov Travel Services in 2003; (2) CWGT was awarded a master task order under the master IDIQ contract in 2007 to provide ETS to DOJ; (3) CWGT was issued sub task orders under the master task order in 2008 to provide additional travel services to DOJ; and (4) Omega provided travel services to DOJ first as a sub-contractor under the ETS master IDIQ contract and then under a task order issued under the Travel Services and Solutions master IDIQ contract.

plaintiff's proprietary and confidential competitive information to CWGT in violation of the Procurement Integrity Act, 41 U.S.C. § 423 (2000) ("PIA").

The government and CWGT both contend that the plaintiff lacks standing to challenge the master task order or the sub task orders issued under the master task order because the plaintiff did not compete for the master IDIQ contract in 2003 and was not eligible to receive the master task order or sub task orders. The government further contends that the plaintiff's breach of contract claims are barred by the Contract Disputes Act, 41 U.S.C. §§ 601 - 613 (2000) ("CDA"), because the plaintiff failed to comply with the mandatory exhaustion requirements of the CDA. In the alternative, the government and CWGT contend that the contracting officer's decision to award the master task order to CWGT is supported by the administrative record and that the master task order is within the scope of the master IDIQ contract under which it was awarded. Finally, the government asserts that the administrative record demonstrates that any communication between the government and CWGT did not violate the PIA. For the reasons set forth below, the government's motion is **GRANTED**, CWGT's motion is **GRANTED**, and the plaintiff's motion is **DENIED**.[2]

---

[2] In addition, the plaintiff's motion to supplement the administrative record is **DENIED** as moot. Any dispute regarding the documents sought by the plaintiff's original motion to supplement, filed on April 11, 2008, was resolved during the April 30, 2008 status conference. The proposed additions to the record that were included in the plaintiff's appendix to the plaintiff's counter-statement of facts, filed on May 16, 2008, are not relevant to the jurisdictional analysis or to the scope of the award and thus will not be considered by the court. See infra n.13.

## BACKGROUND FACTS

The following facts are not disputed unless otherwise noted. Executive branch agencies of the government obtain travel services for their employees through the General Services Administration ("GSA") under two main multiple award IDIQ contracts: the E-Gov Travel Services ("ETS") contract and the Travel Services Solutions ("TSS") Schedule 599 contract. Def.'s Appendix ("DA") 02. Task orders issued under the TSS master IDIQ contract provide for traditional, non-web-based government travel services utilizing travel-agent-assisted reservation and fulfillment services. Id. These services are often referred to as Travel Management Center ("TMC") services and are provided by on-site offices or call centers. Id. Task orders issued under the ETS master IDIQ contract require, in addition to TMC services, the capability for booking, ticketing, and on-line authorization and vouchering services to be provided electronically through a self-service system. Id. The goal of the ETS is to provide

> a common government-wide, web-based service that applies world-class travel management practices to consolidate federal travel, minimize travel costs, and produce superior customer satisfaction. In addition, ETS leverages state-of-the-art technologies to streamline travel processes and deliver a trusted, easy to use, integrated travel management service to the desktop of every government traveler.

DA 010.

When travel services are procured by an agency under the ETS master IDIQ contract, TMC services can be provided by the ETS contractor, or by a separate TMC provider, through one of two different approaches: the "accommodated" approach or the

"embedded" approach.[3] The "accommodated" approach is used when an existing TMC, not in privity of contract with the ETS contractor, provides TMC services, and the ETS contractor provides non-TMC services. DOJ AR 1074, 1076-77.[4] The "embedded" approach is used when the ETS contractor or a contractor in privity of contract with the ETS contractor provides TMC services. Id. All executive branch agencies are currently

---

[3] The E-Gov Travel Service Ordering Guide, last updated on November 15, 2007, provides as follows regarding the accommodation of TMCs:

> The ETS contracts were designed to ensure that the vast majority of travel management needs for Federal Agencies could be met within a single, consolidated environment. Accordingly, each ETS vendor solution offers comprehensive reservation and fulfillment services through both online and agent-assisted channels. The current contract structures should satisfy most Agency travel management requirements. Agencies that currently have contract commitments with TMCs outside of ETS may transition from their current TMC to ETS non-self service reservations and fulfillment as their contract commitments expire.
>
> Agencies with exceptional needs (e.g., unique business, location, or security requirements) or those agencies that elect to procure TMC services directly may wish to use non-ETS TMCs for agent-assisted services. . . . Accordingly, all ETS vendors are required to accommodate the services of TMCs under direct contract to Federal Agencies.
>
> Agencies should become familiar with the services provided by their non-ETS TMC to determine what services are being provided and which ETS line items correspond to those services before placing their ETS order. Agencies that use non-ETS TMCs must adhere to FTR requirements and need to use ETS for the remainder of their travel management functions.

DA 014-015.

[4] Because this protest concerns both an IDIQ contract issued to CWGT by GSA and related task orders issued to CWGT by DOJ, the government submitted the administrative record in two portions. The administrative record concerning DOJ's issuance of the task orders to CWGT is referred to as "DOJ AR" and the administrative record concerning the GSA master IDIQ contract is referred to as "GSA AR."

required by the Federal Travel Regulations ("FTR") to obtain travel services through ETS unless an agency has been granted an exception.[5] DA 01. All ETS contracts are awarded through a government-wide acquisition contract ("GWAC"). Id.

In November 2003, GSA awarded three competitively-bid ETS master IDIQ contracts to CWGT, Electronic Data Systems Corp. ("EDS"), and Northrop Grumman Mission Systems ("Northrop Grumman"). DA 05. The scope of CWGT's ETS master IDIQ contract ("master IDIQ contract") is set forth in section C of the contract, which provides:

> This contract is for an end-to-end travel management service that is owned, hosted, and operated by [CWGT] and is provided to the Federal Government via a web portal environment. The [ETS] is intended to permit agencies to perform all aspects of official travel management online with processes and procedures consistent with applicable travel regulations and policies.

Id. The master IDIQ contract specifically requires that CWGT have the ability to provide traditional TMC services, or to accommodate an existing TMC provider:

> The [CWGT] [ETS] Solution is fully capable of accommodating and incorporating the services of existing TMCs under contract or task order to Federal Agencies for the purpose of making travel reservations as authorized under that contract/task order. The [CWGT] [ETS] Solution will be responsible for delivering the reservation services detailed in the Statement of Work,

[5] FTR § 301-73.100 provides that "unless [an agency has] an exception to the use of the [ETS] (see §§ 301-73.102 and 301-73.104), [it] must have fully deployed the [ETS] across [the] agency and require employees to use the [ETS] for all temporary duty travel no later than September 30, 2006." FTR § 301-73.104 requires that, if an agency seeks an agency-wide exception from the [ETS] requirement, the agency must present a "business case analysis" to demonstrate that the agency's current Travel Management System . . . is a better value." FTR § 301-73.104(a)(1).

> whether provided through [ETS], FedTripTM and/or the TMC under contract to the Federal agency.

Id.

In 2004, DOJ awarded a task order to EDS under its ETS master IDIQ contract for the provision of end-to-end, comprehensive travel management services. DOJ AR 1053. Although Omega did not submit a bid to GSA for an ETS master IDIQ contract, DA 03-04, under the master IDIQ contract held by EDS, Omega provided on-site TMC services to DOJ as an "embedded" TMC in privity of contract with EDS. DOJ AR 1074. In 2005, DOJ terminated its contract with EDS for convenience, but continued to receive on-site TMC services from Omega by issuing task orders to Omega under the TSS master IDIQ contract through DOJ Contract Nos. DJJ05F1183 and DJJ05G1270. Id.

On March 14, 2006, DOJ issued Request for Quotation ("RFQ") DJJD06RFQ0387, titled "E-Gov Travel Service," with the goal of awarding "a Tailored Master Task Order between the [DOJ] and one of the qualified [GSA] [ETS] Contractors. The DOJ's ETS solution shall meet the functional, technical and security needs of the DOJ travel community and support the Department's mission." DOJ AR 677 (emphasis added). The RFQ was issued to the two remaining ETS master IDIQ contractors, Northrop Grumman and CWGT.[6] DOJ AR 164. The RFQ incorporated the terms and conditions of the ETS master IDIQ contract. DOJ AR 678. The RFQ identified the following ETS travel

---

[6] As noted above, the third ETS master IDIQ contractor, EDS, was terminated for convenience in 2005, and therefore did not receive the RFQ.

functions required by DOJ to be included in the proposals: (1) travel planning and cost estimation; (2) travel creation and approval workflow documentation; (3) reservation booking and fulfillment services; (4) filing, processing, and workflow approval of travel claims; (5) interface with DOJ business systems; and (6) reporting and data exchange. Id. The RFQ also identified the following additional travel services that would be required by DOJ: (1) federal travel processes and travel management expertise; (2) web-based reservation service; (3) training; (4) implementation and integration planning and support; (5) travel workflow creation with protected user roles; (6) customer support including ETS functional and technical support for related integration issues; and (7) DOJ-specific requirements and objectives. Id.

In addition, the RFQ indicated that, at that time, DOJ was using a TMC, Omega, for certain travel services under a task order that was procured through GSA's TSS master IDIQ contract, and stated that "DOJ and its components intend to continue using the TSS TMC [Omega], requiring the E-Gov Travel Contractor to accommodate the TMC, if necessary. . . . DOJ and its components reserve the right to exercise the option to procure TMC services through the DOJ E-Gov Travel Master Task Order." DOJ AR 1053 (emphasis added). In response to the RFQ, DOJ received proposals from the two ETS master IDIQ contractors to which the RFQ was issued: CWGT and Northrop Grumman. DOJ AR 164, 173, 189. Because Omega did not hold one of the ETS master IDIQ contracts, Omega was not given notice of the RFQ, nor did Omega submit a proposal in

response to the RFQ.[7] After reviewing the two proposals, the contracting officer determined that CWGT's proposal offered the best value to the government, DOJ AR 170-188, and on June 20, 2007, DOJ issued Task Order DJJ07G1554 ("master task order") to CWGT for "E-Travel Management Services." DOJ AR 17-125.

The Executive Summary of the master task order awarded to CWGT provided:

> The DOJ requires an ETS that shall improve the Department's travel management processes and meet the Department's functional, technical, and security requirements. The ETS shall, but is not limited to: Provide a web-based, self-service, end-to-end travel solution; Meet the Department's travel services needs which include travel planning, cost estimation, travel authorization creation, booking of travel reservations, travel fulfillment, filing/processing/approval of official travel claims and local travel; Supply travel reporting and data exchange for the Department; Eliminate the need for hard copy travel documentation currently used at the DOJ.

DOJ AR 22. Regarding TMC services, the master task order stated:

> Currently, the DOJ uses a single [TMC] procured through the [TSS] schedule. DOJ and its components intend to continue using the TSS TMC, requiring the E-Gov Travel Contractor to accommodate the TMC, if necessary. However, DOJ and its components reserve the right to exercise the option to procure TMC services through the DOJ E-Gov Travel Master Task Order [the master task order]. The ETS contractor shall accommodate DOJ's TSS TMC with their solution. The relationship between ETS and the accommodated TMC is very important and must be thoroughly understood.

DOJ AR 37. The master task order also set forth the following personnel requirements:

> The Government anticipates that the work to be performed under this contract will involve access to sensitive but unclassified materials (otherwise known as "Limited Official Use") and non-sensitive materials. . . . If a change in classification occurs and the contractor personnel will require access to

---

[7] It is not disputed that Omega was not entitled to notice because it was not one of the ETS master IDIQ contractors.

> classified information originated by or in the custody of the Department of Justice, than [sic] such access shall be processed through the National Industrial Security Program. In general, services performed by Contractor personnel may fall within three "risk" categories as described below: (a) High Risk . . . (b) Moderate Risk . . . (c) Low Risk (Non-sensitive) . . . . Work performed under this contract will fall within one or more of the risk categories defined . . . above. As a result, the Contractor's personnel must undergo a background investigation. The type of background investigation required will be commensurate with the risk factor associated with the duties of each position.

DOJ AR 47. The master task order further specified that, for planning purposes, the government estimated that DOJ would require zero high risk positions, ten moderate risk positions, and zero low risk positions, and that three of the ten moderate risk positions would need Top Secret clearances due to the "nature of information possessed by the law enforcement components within DOJ." DOJ AR 48. The master task order included Contract Line Item Numbers ("CLINs") to allow for the ordering of "Supplemental Security Services" (CLINs 0028, 0048, and 0068) and "Non-Self Service," or TMC, travel assistance (CLINs 0020AC, 0020AD, 0020AE, 0040AC, 0040AD, 0040AE, 0060AC, 0060AD, and 0060AE). DOJ AR 13-15.

On August 24, 2007, CWGT offered to discount its fees if DOJ used CWGT for its TMC services instead of requiring CWGT to accommodate Omega as the TMC provider. DOJ AR 1077, 1101-02. Shortly thereafter, in September 2007, the Omega task orders were modified, through Modification 001 to Master Order DJJ05F1183 and Modification 003 to Master Order DJJ05G1270, to extend the period of performance of TMC services by Omega through September 30, 2008. DOJ AR 1068, 1070. The Modifications,

however, also included a provision reserving the government's right to terminate the task orders upon providing Omega with at least 45 days' written notice. Id. In a September 6, 2007 email from DOJ to Omega notifying Omega of the extensions to its task orders, DOJ also stated: "DOJ plans to use the e-travel imbedded [sic] TMC approach as opposed to using the accommodated TMC approach. This means that we will likely not be re-competing the TMC services for DOJ next year." DOJ AR 1071. Omega confirmed this plan in an email from Goran Gligorovic, Executive Vice President, on September 6, 2007, asking, "Does this mean that as of September of next year DOJ is planing [sic] to switch all travel services to [CWGT]?" DOJ AR 1072. DOJ's Contracting Officer, Connie Simmons, responded on September 10, 2007, stating: "Our choices are to either recompete the TMC services among the GSA TMC providers (accommodated) or go w/the embedded TMC. Right now our plan is to go w/the embedded TMC [CWGT]. The switch will not happen all at once I don't believe." Id. DOJ did not, however, confirm that the switch would not occur until September 2008.

In evaluating CWGT's offer to discount its costs, sometime in the fall of 2007 DOJ performed a limited cost analysis, DOJ AR 1073, 1098-1100, and decided to transition its TMC services from Omega to CWGT, or from the "accommodated" approach to the "embedded" approach, with a goal of completing the transition by mid-2008. DOJ AR 1087. In a November 6, 2007 email, CWGT was notified of DOJ's decision to transition its TMC services to CWGT. Id. In that email, the Contracting Officer stated that DOJ

hoped "to issue sub-task orders approximately 60 days prior to transition to [CWGT] . . . the target date established for having the TMC Services for all components/Bureaus implemented is June 30, 2008." Id. On November 7, 2007, the master task order was modified to reflect the discounted pricing.[8] DOJ AR 1088-1090. On January 9, 2008, DOJ issued two task orders, DJJ1554-0001 and DJJ1554-0002, to CWGT ("sub task orders") that effectively transferred responsibility for TMC services to CWGT. DOJ AR 1-4, 1051. On February 15, 2008, DOJ, pursuant to the Modifications to the task orders held by Omega, issued 45 days' written notice to Omega of its intent to terminate Omega's task orders by close of business on March 30, 2008. DOJ AR 1095.

Omega alleges that, in the fall of 2007, "two [CWGT] representatives walked into Omega's on-site office escorted by DOJ personnel, unannounced and uninvited, and advised Omega's two on-site employees that [CWGT] was taking over the account" and attempted to recruit the Omega employees. DOJ AR 1045, 1055. The government agrees that a DOJ representative escorted CWGT employees to Omega's on-site office in the fall of 2007, but asserts that the visit "was not to facilitate [CWGT's] recruitment of Omega employees, but [to] allow [CWGT] to determine what equipment [CWGT] might need to acquire to provide embedded TMC services" to DOJ. DOJ AR 1056. Omega further

[8] The Modification increased the unit prices for CLINs 0020AA, 0020AC, and 0020AD, which covered Self-Service Domestic and International Travel by air or rail and Non-Self Service Domestic and International travel by air or rail. DOJ AR 1090. The Modification also reflected the discount to be provided by CWGT, stating that "[i]n every month that [CWGT] is providing the DOJ TMC services, [CWGT] will discount the Implementation milestone payment invoice submitted in that month by 13.6%." Id.

alleges that, on January 18, 2008, a CWGT employee "showed up on-site, again unannounced, and began the recruiting process" by asking the on-site employees to complete applications and agree to be interviewed. DOJ AR 1045. The government contends that DOJ had no involvement in the January 18, 2008 visit. DOJ AR 1056. Omega finally contends that DOJ provided CWGT with the names, phone numbers, staff positions, and locations of Omega employees. DOJ AR 1046. The government admits that DOJ provided CWGT with phone numbers for the following Omega personnel on September 20, 2007: Phil Downs, Alneta Williams, Annette Frazier, and J.T. Gibbs. DOJ AR 1056. The government asserts that these phone numbers are not confidential and are available on publicly accessible websites. Id.

On February 1, 2008, Omega filed a "pre-award agency-level protest" with DOJ, challenging DOJ's decision to transition its TMC services from Omega to CWGT. DOJ AR 1044-49, 1051. First, Omega alleged that DOJ disclosed Omega's confidential and proprietary information to CWGT in anticipation of the transition in violation of the PIA. Furthermore, Omega alleged that the manner by which DOJ proposed to transition TMC services to CWGT violated the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253 (1984), because the proposed contract modifications materially departed from the scope of the original procurement of CWGT's master IDIQ contract. Specifically, Omega argued that it is able to provide classified travel services for DOJ's Witness Protection Program which are outside the scope of CWGT's master task order and master IDIQ contract.

Finally, Omega challenged the fairness of the overall solicitation process for government travel contracts, alleging that CWGT has an unfair competitive edge in pricing due to its large presence in the government travel market.

The Agency Protest Official, Wilson L. Silvis, Deputy Assistant Director, Procurement Policy and Review Group, interpreted Omega's protest as a challenge to the award of the sub task orders to CWGT in 2008. DOJ AR 1051. Mr. Silvis reviewed Omega's protest and denied it on March 6, 2008, DOJ AR 1051-58, holding that Omega's protest was not timely and that Omega was not an interested party to the procurement. DOJ AR 1052-54. Specifically, Mr. Silvis determined that, because Omega did not hold an ETS master IDIQ contract, "Omega therefore did not, and in fact could not have, participated in the procurement process that resulted in the issuance of the [master task order] to [CWGT] or the task orders issued under the [master task order]. . . . Omega is not eligible to receive an award under the ETS contract because Omega is not one of the ETS contractors." DOJ AR 1055. Mr. Silvis also determined that Omega's challenge could not properly be construed as a "pre-award" protest, because the sub task orders were issued to CWGT on January 9, 2008, and that its challenge to the award of the sub task orders was not timely as a post-award protest because it was not filed within ten days of the award as required by 48 C.F.R. § 33.103(e). DOJ AR 1053. Mr. Silvis further held that, because Omega was aware as early as September 2007 that DOJ had awarded the master task order to CWGT and intended to transfer its TMC services to CWGT, any challenge to the award of the master task order should have been made at that time. DOJ AR 1054.

In response to Omega's allegations that DOJ improperly disclosed Omega's proprietary information, Mr. Silvis determined that "there has been no improper disclosure of proprietary information or other wrongdoing." DOJ AR 1056. Mr. Silvis found that any information provided by DOJ to CWGT about Omega was public information and was not confidential, and that DOJ had not been involved in any way in CWGT's attempts to recruit Omega's employees. Id. Finally, Mr. Silvis determined that Omega's allegation that the task orders awarded to CWGT fell outside the scope of the ETS contract was without merit, finding that "the services offered by ETS, including the security requirements, are broader than the services offered by TSS. Indeed, the TSS contract is limited to TMC services, while the purpose of the ETS is to provide complete, end-to-end travel services, including TMC." DOJ AR 1057.

On February 29, 2008, Omega filed the instant "pre-award" bid protest complaint. In its complaint, Omega challenges the award of the master task order to CWGT, the termination of Omega's contracts with DOJ for the provision of TMC services, and DOJ's compliance with the PIA. The court granted CWGT's motion to intervene on March 19, 2008, and on March 31, 2008, the government filed a motion to dismiss, or, in the alternative, a motion for judgment upon the administrative record. On April 11, 2008, Omega filed a motion to supplement the administrative record. On April 15, 2008, CWGT filed a motion to dismiss, or, in the alternative, a motion for judgment upon the administrative record. On April 15, 2008, Omega filed a cross-motion for judgment upon

the administrative record.[9] Following receipt of all response and reply briefs, oral argument was heard May 30, 2008.

## DISCUSSION

### I. Introduction

In its complaint, Omega alleges that: (1) DOJ's decision to transition its TMC services from Omega to CWGT by awarding the sub task orders violates CICA because it did not utilize full and open competition and because the master task order under which the sub task orders were awarded is outside the scope of the master IDIQ contract; (2) DOJ's decision to terminate Omega's task orders violated its implied duty of good faith and fair dealing; and (3) DOJ disclosed Omega's proprietary information to CWGT in violation of the PIA and the Trade Secrets Act, 18 U.S.C. § 1905 (2000). Compl. ¶ 24-26.

The government and CWGT have moved to dismiss Omega's complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction, arguing that (1) Omega lacks standing to allege that the government acted in bad faith when it terminated the contracts between Omega and DOJ; and (2) Omega lacks standing to challenge the master task order and the sub task orders awarded to CWGT. In the alternative, the government and CWGT have moved for judgment upon the administrative record, arguing that the master task

[9] On May 27, 2008, the government filed a notice of objection to the plaintiff's counter-statement of facts and its exhibits and a motion to strike those portions of the plaintiff's briefs relying on its facts and exhibits. Because no portion of the plaintiff's counter-statement of facts or exhibits that is not also included in the administrative record is relevant to the jurisdictional analysis or to the scope of the award, the court does not rely on these materials, and the government's motion is **DENIED** as moot. See infra n.13.

order awarded to CWGT was within the scope of the master IDIQ contract and was therefore properly issued to CWGT. The government also asserts that its actions did not violate the PIA, the Trade Secrets Act, or any other procurement statutes or regulations. In response, Omega has also moved for judgment upon the administrative record, arguing first that the government was required to conduct a best value analysis before making the decision to transition its TMC services from the "accommodated" approach to the "embedded" approach and second that the master task order and sub task orders issued to CWGT contemplate services outside the scope of the master IDIQ contract. Each of these arguments will be addressed in turn.

## II. Omega's Standing to Challenge DOJ's Actions

### A. Standard of Review

The government and CWGT have moved to dismiss Omega's claims under RCFC 12(b)(1) for lack of subject matter jurisdiction. Both parties argue that Omega lacks standing to challenge the award of the task orders to CWGT because Omega is not an interested party that was substantially prejudiced by the alleged errors in the procurement process. Furthermore, both parties contend that the court lacks jurisdiction to hear Omega's "bad faith termination" claims regarding its contracts with DOJ because Omega did not comply with the mandatory exhaustion requirements set forth by the CDA, 41 U.S.C. §§ 605(a) - (c), which requires a contractor to submit any contract-related claims against the government to the contracting officer before filing a claim with this court.

In considering a motion under RCFC 12(b)(1) to dismiss for lack of subject matter jurisdiction, the court is generally "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). The ultimate burden, however, is on the plaintiff to prove that the court has jurisdiction to hear its claims. See, e.g., Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991) ("A party seeking the exercise of jurisdiction in its favor has the burden of establishing that such jurisdiction exists."). Standing is a matter of jurisdiction, and a bid protestor invoking the jurisdiction of this court must establish its standing to do so. See, e.g., Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002); A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). The portion of the Tucker Act that confers jurisdiction upon this court to hear bid protest claims provides:

> Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2000) (emphasis added). The Federal Circuit has defined the term "interested party" as an "actual or prospective bidder[] or offeror[] whose direct economic

interest would be affected by the award of the contract or by failure to award the contract." Rex Serv. Corp., 448 F.3d at 1307 (quoting American Fed'n of Gov't Employees v. United States, 258 F.3d 1294, 1298 (Fed. Cir. 2001)).

**B. Omega Lacks Standing to Assert A Breach of Contract Claim.**

In its complaint, Omega alleges that DOJ "improperly and in bad faith" terminated the task orders under which Omega provides TMC services to DOJ. Compl. ¶ 4. The government contends that Omega's challenge of DOJ's decision to terminate the task orders is not properly before the court, asserting that Omega did not comply with the mandatory exhaustion requirements of the CDA. While this court has jurisdiction under the Tucker Act[10] to consider claims for breach of contract arising under the CDA, the CDA requires contractors to comply with specific requirements before filing suit in this court. Specifically, the CDA requires that "[a]ll claims by a contractor against the government relating to contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). "[T]o gain a jurisdictional foothold in this court, a

---

[10] The Tucker Act states:

> The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

28 U.S.C. § 1491(a)(2) (2000).

plaintiff pursuing a contract claim must satisfy two fundamental jurisdictional requirements – it must submit a claim for money presently due and must obtain a 'final decision' on the claim, either actual or deemed." Witherington Constr. Corp. v. United States, 45 Fed. Cl. 208, 211 (1999). The Federal Circuit has accepted the definition of the term "claim" set forth by the Federal Acquisition Regulations ("FAR") 33.201, 48 C.F.R. § 33.201, as "a written demand or written assertion by one of the contracting parties seeking as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising or relating to the contract." See, e.g., England v. The Swanson Group, Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004); James M. Ellet Const. Co., Inc. v. United States, 93 F.3d 1537, 1542 (Fed. Cir. 1996); Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc).

The government contends that Omega did not conform with the requirements of the CDA, asserting that Omega did not submit a claim to the contracting officer, and did not request or obtain a final decision from the contracting officer regarding its claim. Omega concedes that it has not yet filed a claim with the contracting officer as required by the CDA. However, Omega contends that its allegations that DOJ terminated its task orders in bad faith are still relevant to its bid protest, because DOJ's decision to terminate Omega's task orders and to award task orders covering similar services to CWGT violated the implied duty of good faith and fair dealing. Omega argues that this assertion is relevant to the propriety of DOJ's actions.

The court agrees with the government that Omega's claim of bad faith termination is not properly before the court and should be dismissed for lack of subject matter jurisdiction. Omega did not submit a claim alleging bad faith to the contracting officer, and thus did not comply with the jurisdictional requirements set forth by the CDA. Whether Omega's allegations of bad faith are relevant to the propriety of DOJ's decision to award the task orders to CWGT will be addressed in the court's consideration of the merits of Omega's claim.

### C. Omega Has Standing to Allege that the Master Task Order Exceeds the Scope of the Master IDIQ Contract.

A party can typically challenge a task order issued under an IDIQ master contract only under very limited circumstances, as outlined by the Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub.L. No. 103-355, 108 Stat. 3243 (1994), and implemented by the FAR. The goal of FASA was to streamline the bid protest process: "The revised contracting procedures and the new, accelerated notice of contract awards, contract debriefings, and bid protest are all designed to reduce staff time, lessen the amount of paperwork required, and shrink the bureaucracy." 140 Cong. Rec. H9240, H9245 (1994). "In particular, when a procurement envisioned a multiple award IDIQ contract, creating, through competition, a pool of contractors for certain work projects, the issuance of individual task orders to these contractors would not be subject to protests." A&D Fire Prot., 72 Fed. Cl. at 133 (citing Pub.L. No. 103-355, § 1054). "Task or delivery order contracts 'essentially create a menu of goods or services of an indefinite quantity that can

be ordered by an agency on an as needed basis.'" Savantage Fin. Servs., Inc. v. United States, 81 Fed. Cl. 300, 307 (2008) (quoting Corel Corp. v. United States, 165 F.Supp.2d 12, 20 (D.D.C. 2001)). If "the task order or delivery order contract itself has been obtained through full and open competition," id., a protest of a task order issued under an IDIQ contract is only authorized if it alleges that a task order "increases the scope, period, or maximum value of the [master IDIQ] contract under which the order is issued." 41 U.S.C. § 253j(d) (emphasis added); see also FAR 16.505(a)(9). It is against this backdrop that the court will examine Omega's challenge to the task orders at issue.

### 1. Omega May Challenge the Scope of the Master Task Order.

In its complaint, Omega alleges that the services to be provided by CWGT under the protested task orders materially depart from the scope of the ETS master IDIQ contract held by CWGT, and Omega therefore contends that the award of the task orders to CWGT violated CICA. Compl. ¶ 4. Specifically, Omega contends that it currently provides DOJ with Witness Protection Program services that require the handling of restricted information and materials, and that the master task order only covers the handling of sensitive but unclassified materials.

The government and CWGT contend that, while Omega does allege in its complaint that the master task order issued to CWGT exceeds the scope of its ETS master IDIQ contract, even if Omega's allegation is true, the court still lacks jurisdiction over Omega's challenge of the award of the master task order and the sub task orders to CWGT because Omega does not have standing to bring such a claim. They allege that Omega is not an

interested party to the award of either the master task order or the master IDIQ contract to CWGT because Omega was neither an actual nor a prospective bidder and thus was not eligible to receive the master task order or the subsequent sub task orders. It is not disputed that Omega did not submit a proposal in response to the RFQ under which the master task order was awarded to CWGT in 2007. Furthermore, it is not disputed that Omega was not eligible to submit a proposal because the RFQ was issued only to the prime contractors in GSA's ETS program who were awarded an ETS master IDIQ contract in 2003, and Omega was not awarded and did not compete for an ETS master IDIQ contract in 2003.

Omega asserts that it is nonetheless an interested party and has standing to protest the award of the master task order because "a grant of the relief requested would require disqualification of [CWGT], and necessitate Plaintiff's maintaining performance of the services at issue until solicitation of those services via a competitive bid process in compliance with procurement statute and regulation, FAR and CICA requirements is completed." Compl. ¶ 7. Furthermore, Omega contends that because the sub task orders will require CWGT to provide services that fall outside the scope of the master IDIQ contract, and therefore were not properly awarded to CWGT, DOJ will have to procure its TMC services through a new contract, for which Omega could and would compete. Accordingly, Omega argues that it has standing to allege that the master task order was not properly awarded to CWGT.

The court agrees with Omega that it does have standing, under 41 U.S.C. § 253j(d) and FAR 16.505(a)(9), to allege that the services required under CWGT's master task order exceed the scope of the master IDIQ contract. Omega's standing is based on the fact that it is a potential recipient of a contract to provide TMC services to DOJ. This court has held that, "[w]here a claim is made that the government violated CICA by refusing to engage in a competitive procurement, . . . 'it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals.'" Savantage, 81 Fed. Cl. at 306 (quoting CCL, Inc. v. United States, 39 Fed. Cl. 780, 790 (1997)). "To have standing, the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive." Myers Investigative & Sec. Servs., 275 F.3d at 1370-71 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001)). Omega has sufficiently established that it likely would have competed for a contract for TMC services had the contract been competitively bid; accordingly, Omega has standing to challenge the award of the master task order, and sub task orders, to CWGT for exceeding the scope of the master IDIQ contract.

### 2. Omega's Challenge Is Limited to Its Allegation That the Master Task Order Exceeds the Scope of the Master IDIQ Contract.

Omega contends that, while FASA and the FAR do limit protests concerning IDIQ task orders, such protests are not limited when an agency violates CICA or other procurement statutes in deciding to award a task order under an IDIQ, and thus seeks to

challenge the award of the sub task orders on the grounds that DOJ was required to undertake a competitive procurement to obtain TMC services regardless of whether the TMC services it required were within the scope of the master IDIQ contract. Omega relies on the holding in Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22 (2007), in which the protestor, in a pre-award bid protest, challenged the government's decision to solicit proposals for dredging projects using IDIQ multiple award task order contracts, arguing that the change from competitive sealed bidding procedures, which were used historically in soliciting proposals for dredging projects, to IDIQ task orders was contrary to law and had no rational basis. Id. at 23. The protestor alleged that, in order to switch from sealed bidding to IDIQ task order contracting, the government would have to satisfy 10 U.S.C. § 2304(a), which requires the use of sealed bidding when the conditions set forth in 10 U.S.C. § 2304(a)(2) are met. The court held that, because the government did not identify any significant changes that would justify the switch to IDIQ task order contracting, and because the administrative record did not contain any analysis of 10 U.S.C. § 2304, the government's decision to use IDIQ task orders was made in violation of law. Id. at 30.

The government and CWGT assert that Omega's reliance on Weeks Marine in support of its argument is misplaced. As set forth above, Weeks Marine dealt with a challenge to an agency's decision to utilize IDIQ task order contracting to procure dredging services in the first instance. The parties contend that, in the instant protest, Omega is not challenging DOJ's decision to utilize IDIQ task order contracting to procure

travel services. The parties argue that this decision was made by DOJ in 2003 when it solicited and awarded three master IDIQ contracts to CWGT, Northrop Grumman, and EDS, and any objection to that decision should have been made at that time. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").

The court agrees with the government and CWGT that Weeks Marine is not relevant to Omega's protest. Weeks Marine dealt with a challenge to an agency's initial decision to utilize IDIQ task order contracting to procure necessary services. Omega did not, in 2003, protest DOJ's decision to procure travel services through IDIQ task order contracting. Instead, Omega's current protest challenges DOJ's decisions in 2007 to award a master task order to CWGT and in 2008 to award sub task orders to CWGT under the master IDIQ contract CWGT received in 2003.[11] Challenges to a task order awarded

[11] CWGT contends that, under Blue & Gold, Omega's challenge of the task order awards to CWGT in 2007 and 2008 is untimely. CWGT asserts that, because Omega did not protest DOJ's decision to issue an RFQ for the master task order under the master IDIQ contract in 2006, and did not protest DOJ's decision to issue the sub task order to CWGT in 2008, Omega is barred from raising such claims now. CWGT contends that Omega should have protested the RFQ issued under the master IDIQ contract by DOJ in 2006, before the master task order was awarded to CWGT. However, Omega did not receive the RFQ from DOJ because Omega was not a master IDIQ contractor, so Omega did not have notice of the RFQ before CWGT was awarded the master task order. CWGT further contends that Omega should have protested DOJ's decision to switch from the accommodated TMC approach to the embedded TMC approach when it received notice, via email, of that decision in 2007. However, while the email Omega received from DOJ indicated that DOJ planned, at some point in the future, to possibly

under a master IDIQ contract are limited by FASA to allegations that the task order increases the "scope, period, or maximum value of the contract under which the order is issued." 41 U.S.C. § 253j(d); A&D Fire Prot., 72 Fed. Cl. at 133; Phoenix Air Group, Inc. v. United States, 46 Fed. Cl. 90, 105 (2000). Accordingly, Omega's challenge of the task orders at issue in this case is limited to its allegations that the task orders exceed the scope of the ETS master IDIQ contract to include services not contemplated by the master IDIQ contract, and the court will consider the merits of this claim. All other allegations made by Omega challenging the award of the task orders are barred by FASA and may not be considered by this court.

## III. The Government and CWGT Are Entitled to Judgment Upon the Administrative Record.

### A. Standard of Review

This court has jurisdiction, pursuant to 28 U.S.C. § 1491(b), "to render judgment on an action by an interested party objecting to a . . . proposed award or award of a contract." 28 U.S.C. § 1491(b)(1). The court must review the contracting agency's decision pursuant

---

switch from the accommodated approach to the embedded approach, the email did not constitute an official DOJ procurement decision. Any protest by Omega in 2007 upon receipt of the email from DOJ would have been premature. Omega did not learn until January 25, 2008 that DOJ had officially decided to transition its TMC services from Omega to CWGT, and was not required to challenge the decision to issue the sub task orders before it received notice of that decision. See Allied Materials & Equip. Co., Inc. v. United States, 81 Fed. Cl. 448, 459 (2008) (holding that a protestor did not waive its right to challenge an amendment to a solicitation when it was not aware of the terms of the amendment). Accordingly, CWGT's contention that Omega's challenge that the master task order and sub task orders are out of scope is barred by Blue & Gold goes too far.

to the standards set forth in the Administrative Procedures Act, 5 U.S.C. §§ 701-706 (2000), which requires a court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). See also Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).

The court "may not substitute its judgment for that of the agency" if the agency's decision is reasonable. R&W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003). However, the court may set aside an award if "the procurement official's decision lacked a rational basis; or . . . the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni, 238 F.3d at 1332. An agency's decision should be set aside if it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 127 S.Ct. 2518, 2529-30 (2007) (quoting Motor Vehicle Mfrs. Ass'n. of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

**B. The Master Task Order Awarded to CWGT Under the ETS Master IDIQ Contract Did Not Exceed the Scope of the Master Contract.**

Omega asserts that the master task order awarded to CWGT in 2007 exceeded the scope of the master IDIQ contract under which it was awarded because, while the master

IDIQ contract required the handling of sensitive but unclassified materials, the master task order, and the sub task orders issued in 2008, will require CWGT to handle more restricted information and materials. Specifically, Omega appears to allege that the TMC services provided by Omega, including the Witness Protection Program services, are outside the scope of the master IDIQ contract. In support of its contention, Omega points to the language of the E-Gov Travel Service Ordering Guide, which provides that agencies that have exceptional business, location, or security requirements may wish to use non-ETS TMCs to acquire agent-assisted services. DA 014-015. Omega contends that the Ordering Guide allows for the possibility of an agency requiring services beyond the scope of the ETS master IDIQ contract, which Omega argues is the case with the security services required by DOJ. Omega also relies on the master task order estimate that DOJ would require zero high risk positions, DOJ AR 48, asserting that the actual security needs of DOJ will exceed the estimates set forth by the master task order. Accordingly, Omega contends that CWGT will likely be asked to perform security-related services that exceed the scope of the master IDIQ contract.

In response, the government and CWGT argue that, because CWGT's ETS master IDIQ contract required that CWGT have the capability to either accommodate an existing TMC provider or to provide traditional TMC services,[12] the TMC services that CWGT is

---

[12] CWGT's ETS master IDIQ contract states:

> The [CWGT] [ETS] Solution is fully capable of accommodating and incorporating the services of exiting TMCs under contract or task order to Federal Agencies for the

required to provide under the master task order and the sub task orders, including any security services, were contemplated by the master IDIQ contract, and the award of task orders for those services under that contract was appropriate. Furthermore, the government and CWGT assert that CWGT's master IDIQ contract provides for an "end-to-end travel management service," including traditional TMC services, and therefore that the master task order is clearly within the scope of the master IDIQ contract.

CWGT's master IDIQ contract defines the scope of the contract as follows:

> This contract is for an end-to-end travel management service that is owned, hosted, and operated by [CWGT] and is provided to the Federal Government via a web portal environment. The [ETS] is intended to permit agencies to perform all aspects of travel management online with processes and procedures consistent with applicable travel regulations and policies. Travel management functions include, but may not be limited to, the following: (1) Travel planning and cost estimating; (2) Travel authorization; (3) Booking of reservations; (4) Filing, processing, and approval of official travel claims; (5) Reporting; data exchange, etc.; and (6) Fulfillment services.

GSA AR 17 (emphasis added). The RFQ issued by DOJ in 2006 for the task orders to be awarded under the master IDIQ contract did not specifically identify any additional services to be performed that were not identified in the master IDIQ contract. See DOJ AR 678. The Executive Summary of the master task order awarded to CWGT in 2007

---

> purpose of making travel reservations as authorized under that contract/task order. The [CWGT] [ETS] Solution will be responsible for delivering the reservation services detailed in the Statement of Work, whether provided through [ETS], FedTripTM and/or the TMC under contract to the Federal agency.

GSA AR 33-34.

provides:

> The DOJ requires an ETS that shall improve the Department's travel management processes and meet the Department's functional, technical, and security requirements. The ETS shall, but is not limited to: Provide a web-based, self-service, end-to-end travel solution; Meet the Department's travel services needs which include travel planning, cost estimation, travel authorization creation, booking of travel reservations, travel fulfillment, filing/processing/approval of official travel claims and local travel; Supply travel reporting and data exchange for the Department; Eliminate the need for hard copy travel documentation currently used at the DOJ.

DOJ AR 22. The government and CWGT contend that neither the RFQ nor the master task order require CWGT to provide any services that were not within the scope of CWGT's master IDIQ contract, and accordingly that the master task order was appropriately awarded to CWGT in 2007 and the sub task orders were appropriately awarded under the master task order in 2008.

The court agrees with the government and CWGT that the services contemplated by the master task order and the sub task orders awarded to CWGT were not outside the scope of the master IDIQ contract under which they were awarded. Omega's primary argument is that, once the TMC services are transitioned to CWGT, CWGT will be required to perform additional services, currently performed by Omega, that were not contemplated by the master IDIQ contract or any of the task orders issued to CWGT. However, Omega has not identified any duties required to be performed by the master task order or the sub task orders that fall outside the scope of the master IDIQ contract. Whether Omega currently performs services outside the scope of the master IDIQ contract

is not relevant; the court must only examine whether the task orders awarded to CWGT require CWGT to perform services outside the scope of the master IDIQ contract. It is clear from the above-quoted portions of the master IDIQ contract and the master task order that CWGT is not being asked to perform any services not contemplated by the master IDIQ contract. Moreover, to the extent that DOJ might require additional services in the future for its Witness Protection Program that are not now included in the sub task orders, the master IDIQ contract and master task order allow DOJ to obtain such services through the CLINs for "Supplemental Security Services" and "Non-Self Service" travel assistance. DOJ AR 13-15. Accordingly, the task orders do not exceed the scope of the master IDIQ contract, and Omega's challenge to the award of the task orders must be rejected. The government and CWGT are entitled to judgment upon the administrative record.[13]

---

[13] Omega also argues that when DOJ decided to transition its TMC services from the "accommodated" approach to the "embedded" approach, DOJ effectively decided to cancel the services that Omega was providing to DOJ without proper competition, and was required to undertake a competitive procurement and perform a thorough best value analysis before deciding to receive its TMC services from CWGT. Omega therefore alleges that the sub task orders awarded to CWGT under the master task order constituted improper sole source procurements. The goal of FASA, in allowing agencies to procure services through task or delivery order contracts, was to "streamline and simplify federal acquisition procedures." Corel Corp., 165 F.Supp.2d at 20. "[W]hen an agency makes an order pursuant to a task or delivery order contract, the agency is not required to publish a notice of solicitation nor is it required to hold a 'competition . . . that is separate from that used for entering into the contract.'" Id. (quoting 41 U.S.C. § 253j(a)(2)) (emphasis added). The court has already determined that Omega's ability to challenge the task orders awarded to CWGT is limited by FASA and the FAR to allegations that the task orders exceeded the scope of the master contract under which they were awarded. The court has also determined that the task orders did not exceed the scope of the master contract. Accordingly, the court does not have authority under FASA to review Omega's challenge to the award of the sub task orders on the grounds that it was an illegal sole source procurement.

### C. DOJ Did Not Violate the Procurement Integrity Act or Any Other Procurement Regulations.

In its complaint, Omega also alleges that the government interfered with Omega's business operations, shared confidential information regarding Omega's business operations, and provided CWGT with the names of Omega's staff, including their confidential staff positions, locations, contact information, and the accounts they service. Compl. ¶ 26. Omega contends that these actions by the government amount to "an improper disclosure by [the government] of [Omega's] proprietary and source selection information pursuant to the PIA, as implemented by FAR § 3.104-3(a) and 3.104-4(b), and a violation of 18 U.S.C. § 1905." Id.

The PIA governs the disclosure of contractor bid, proposal, or source selection information, and prohibits government representatives from "knowingly disclos[ing] contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(a)(1) (emphasis added). The PIA defines "contractor bid or proposal information" as:

> [A]ny of the following information submitted to a Federal agency as part of or in connection with a bid or proposal to enter into a Federal agency procurement contract, if that information has not been previously made available to the public or disclosed publicly: (A) Cost or pricing data . . . . (B) Indirect costs and direct labor rates. (C) Proprietary information about manufacturing processes, operations, or techniques marked by the contractor in accordance with applicable law or regulation. (D) Information marked by the contractor as "contractor bid or proposal information", in accordance with applicable law or regulation.

41 U.S.C. § 423(f)(1) (emphasis added). The PIA also prohibits any person from

protesting an award or proposed award alleging a violation of the PIA "unless that person reported to the Federal agency responsible for the procurement, no later than 14 days after the person first discovered the possible violation, the information that the person believed constitutes evidence of the offense." 41 U.S.C. § 423(g) (emphasis added).

The government argues that Omega's allegations that the government violated the PIA are untimely, because Omega never presented information to DOJ that constituted evidence of the offense, as required by 41 U.S.C. § 423(g), and certainly did not present information to DOJ within 14 days of discovering the potential violation. Furthermore, the government contends that, because any disclosure of information alleged by Omega occurred after DOJ issued the protested task order to CWGT, Omega's allegations do not, on their face, meet the requirement of the PIA that information be knowingly disclosed before the award of the protested contract. While the government concedes that, on September 20, 2007, it provided CWGT with telephone numbers for four Omega employees, it asserts that the telephone numbers were also publicly available on DOJ's travel website and other travel agency websites. The government argues that the information allegedly disclosed by the government, including the names of Omega's personnel and their phone numbers, does not constitute "contractor bid or proposal information" as defined by the PIA, and is not proprietary information because it is publicly available. See, e.g., McKing Consulting Corp. v. United States, 78 Fed. Cl. 715, 727 (2007) (finding that the names, contact information, and pay rates of consultants used

by a contractor were "not subject to PIA protection"); Synetics, Inc. v. United States, 45 Fed. Cl. 1, 14 (1999) (holding that personnel information did not meet the definition of "contractor bid or proposal information" under the PIA).[14]

In its cross-motion, Omega did not address the PIA violations it alleged in its complaint, nor did it respond to the government's contention that its actions did not violate the PIA. In its reply in support of its cross-motion, Omega merely reiterated its allegation that DOJ improperly disclosed Omega's proprietary and source selection information in contravention of the PIA, but did not provide any additional evidentiary support of its allegation.

The court agrees with the government that Omega's contention that DOJ violated the PIA and disclosed Omega's proprietary information to CWGT is without merit.

---

[14] In its complaint, Omega also alleges a violation of the Trade Secrets Act, 18 U.S.C. § 1905, a criminal statute that prohibits government officials from disclosing, among other things, confidential and trade secret information. The government contends that information that is publicly available is not a trade secret, Ruckleshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984), and that the owner of a trade secret must take affirmative steps to prevent the disclosure of the secret to others. Id. The government asserts that, because the information disclosed by DOJ to CWGT was publicly available, and because Omega does not allege that it affirmatively attempted to protect the information, Omega is not entitled to the protection of the Trade Secrets Act. In its cross-motion for judgment upon the administrative record, Omega does not address the Trade Secrets Act allegations asserted in its complaint. Nor does Omega, in its complaint or in its briefs, specifically identify any trade secrets disclosed by DOJ. The court agrees with the government that, because Omega has not offered any evidence to the contrary, Omega is not entitled to any relief under the Trade Secrets Act, and any criminal sanctions contemplated by the Act do not apply to DOJ's actions. In such circumstances, there is no basis for a finding in Omega's favor. See RCFC 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

Omega has not alleged that DOJ released Omega's proprietary and confidential information to CWGT before the award of the master task order on June 20, 2007, as required by the PIA. 41 U.S.C. § 423(a)(1) ("A person . . . shall not, other than as provided by law, knowingly disclose contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." (emphasis added)). Instead, Omega alleges that DOJ violated the PIA in the fall of 2007, after the master task order had been awarded to CWGT, and has not alleged that CWGT utilized Omega's proprietary information to obtain the master task order or sub task orders. Furthermore, Omega's allegations are untimely, because Omega never presented evidence to DOJ that it considered to be "evidence of the offense" under the PIA as required by 41 U.S.C. § 423(g). Accordingly, Omega's contention that DOJ violated the PIA by releasing its proprietary information to CWGT is without merit. The government's motion for judgment on this claim is **GRANTED**.

## CONCLUSION

For all of the foregoing reasons, the government's motion to dismiss, or in the alternative, for judgment upon the administrative record, is **GRANTED**. CWGT's motion to dismiss, or in the alternative, for judgment upon the administrative record, is **GRANTED**. Omega's motion for judgment upon the administrative record is **DENIED**. The Clerk of the Court shall enter judgment accordingly. Each party to bear its own costs.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge